THE STATE v. JAMES P. EDWARDS, Appellant.

Division Two, May 14, 1907.

1. **INSTRUCTION: Provoking Difficulty: No Evidence.** The giving of an instruction on the subject of provoking the difficulty, where, as in this case, there is no evidence upon which to base it, is reversible error.

2. ————: **On Lower Grade of Offense: Erroneous.** Although a defendant cannot complain of a proper instruction covering a lower grade of offense than that of which the evidence shows him to be guilty, he has the right to challenge an instruction which erroneously declares the law as to such offense.

3. ————: **Threats: Provocation: Reducing Grade of Crime.** The admission of threats by deceased against defendant is confined to that class of cases in which the evidence tends to show some act or conduct on the part of the deceased which threatens immediate injury to defendant, or which tends to prove that the homicide was committed in self-defense. And it was error to instruct the jury that such threats constituted an element of provocation which would reduce the homicide from murder to manslaughter.

4. ————: **On Self-Defense: Argumentative.** Where the court has, by its instructions, fully declared the law of self-defense, it is not error to refuse an instruction, requested by defendant, which is argumentative and theoretical, rather than a plain declaration of law.

5. **THREATS: Uncommunicated: For What Purpose Admitted.**
Uncommunicated threats made by deceased are admissible, not
for the purpose of showing apprehension of danger, but as
throwing light upon the acts and conduct of deceased at the
time of the fatal difficulty, and as tending to show who was the
aggressor.

6. **EVIDENCE: Cross-Examination.** It was not error to ask de-
fendant's son, on cross-examination, whether he did not say
in the presence of another party, after having heard of the kill-
ing, "Well, it has happened." Great latitude should be allowed
in the cross-examination of such a witness.

7. ————: **Purchasing Pistols: Immaterial: Impeachment.** Evi-
dence as to the purchase, by defendant's son, of two pistols
several days before the homicide, was irrelevant and imma-
terial and should not have been admitted, there being nothing
to connect it with the homicide, and it being conceded that the
killing was done with a shotgun. And the evidence being imma-
terial, the witness was not subject to impeachment.

8. ————: **Expert.** Testimony of an expert should be admitted
only after a reasonably satisfactory showing that he is quali-
fied to testify as an expert.

Appeal from Audrain Circuit Court.—*Hon. Jas. D.
Barnett,* Judge.

REVERSED AND REMANDED.

*P. H. Cullen, Orlando Hitt* and *E. W. Hinton* for
appellant.

(1) The instruction of the court on the subject
of provoking the difficulty is erroneous. There was no
evidence on which to base it. State v. Walker, 196
Mo. 73; State v. Packwood, 26 Mo. 340; State v. Bail-
ey, 57 Mo. 131; State v. Chambers, 87 Mo. 406; State
v. Herrill, 97 Mo. 111; State v. Johnson, 111 Mo. 584;
State v. Little, 67 Mo. 624; State v. Tice, 90 Mo. 112;
State v. Sturgis, 48 Mo. App. 263; State v. Wilson, 39
Mo. App. 186; State v. Brady, 87 Mo. 142. (2) The
instruction as to manslaughter is erroneous and mis-
leading and without evidence to support it. Previous

threats do not constitute lawful provocation within the meaning of the law. The rule is well nigh universal that facts which might show passion are not admissible when a period of time has elapsed between defendant's first knowledge of them and his action, sufficient for his passion to cool. State v. Grayor, 89 Mo. 600; State v. Herrell, 97 Mo. 105; State v. Baker, 30 La. Ann. 1134; Compton v. State, 117 Ala. 56; State v. Lawry, 4 Nev. 161. Threats, assaults, insulting epithets or charges made at the time of the difficulty are admissible on the issue of provocation but if made previous to the killing such matters are rigidly excluded on the issue of provocation. State v. Brown, 181 Mo. 192; State v. Jackson, 17 Mo. 544; State v. Wood, 124 Mo. 412; Sanchez v. People, 22 N. Y. 147. (3) The court erred in declining to instruct that proof of a wounding in the back or side was not proof of such physical fact as destroyed self-defense. (4) The court's endorsement of the State's contention that uncommunicated threats by deceased are immaterial was error. (5) The ruling permitting defendant's witnesses to be contradicted on collateral issues and opinions was erroneous.

*Herbert S. Hadley,* Attorney-General, *N. T. Gentry,* Assistant Attorney-General, and *John D. Orear* for the State.

(1) The instruction, given by the court, on the subject of manslaughter in the fourth degree, was a proper one. The evidence showed that a threat, made by the deceased, was communicated to the defendant an hour or two before the killing. That just prior to the shooting, the deceased jumped violently from his chair, telling the defendant that he should not live to enjoy deceased's money; and that the defendant, by this sudden action, was excited. If these facts were true, and they were given in evidence by defendant, they

justified the manslaughter instruction. Even if they did not justify such an instruction, the error was one in favor of the defendant, and one for which he cannot complain. This instruction permitted the jury to convict the defendant of a lesser crime than the one he was, according to the evidence, guilty of; hence the error, if error it was, was in his favor. State v. Billings, 140 Mo. 193; State v. Todd, 194 Mo. 377; State v. McMullin, 170 Mo. 609; State v. Nelson, 88 Mo. 126; State v. Bulling, 105 Mo. 204. (2) No error was committed in allowing the State to cross-examine defendant's son on the statement that he made to the witnesses Lincoln Cleveland and Ira Mayes; nor in allowing the State to contradict that statement by proving that, immediately after hearing of the shooting, the son of defendant said, "It has happened." (3) No error was committed in refusing defendant's instruction on the subject of shooting the deceased in the back. Defendant testified that the deceased got up, ran his hand in his pocket and made a motion like he was going to assault the defendant, and started towards him. In the cross-examination of the physicians, who testified for the State, and in the introduction of Dr. Wallace's evidence, defendant was trying to convince the jury that deceased was shot in front, and shot at the time he was starting to attack the defendant. Defendant also introduced evidence tending to show that the deceased, after the shooting, fell on his back on the floor. Hence, the defendant was not entitled to an instruction the opposite of what he himself testified to, and what all of his evidence tended to prove. A party's position must be consistent; he cannot introduce evidence on one theory and then be entitled to have instructions on another. State v. Valle, 196 Mo. 29; State v. Bailey, 190 Mo. 295; State v. Lewis, 118 Mo. 83; State v. Gartrell, 171 Mo. 522.

FOX, P. J.—This cause is here by appeal on the part of the defendant from a judgment of the circuit court of Audrain county convicting him of manslaughter in the fourth degree. On the 27th day of March, 1906, the prosecuting attorney of Audrain county filed an information, duly verified, charging the defendant with murder in the first degree. The date of the homicide charged was March 22, 1906; the name of the party charged to have been killed was John Oldham, and the weapon used was a shotgun. At the June term, 1906, of the Audrain Circuit Court the defendant was put upon his trial upon the charge contained in the information. We shall not undertake to give in detail all of the testimony introduced upon the trial; it will suffice to give the tendency of the testimony to establish certain facts involved in the prosecution.

The State's evidence tended to prove that the defendant and the deceased were engaged in the operation of a coal mine on defendant's farm near Thompson, in Audrain county. A written contract had theretofore been entered into between them, by the terms of which the deceased agreed to pay certain sums at stated times as royalty, and the deceased was to have the exclusive operation of the mine. In addition to the operation of the mine the deceased and his family were given the right to and did occupy a dwelling house and a small piece of ground belonging to the defendant near said mine. Some time prior to the 22nd of March, 1906, there were differences between them as to the amount due and as to the way the mine was being operated. Accordingly, defendant attempted to terminate the lease and instructed the deceased to vacate the mine and also the dwelling house. Deceased and his family moved out of the house over to the Northcutt place and moved some of his tools from the mine a few days prior to the date of the homicide. On the morning of the homicide the deceased went to the mine for

the purpose of getting some tools and a telephone box, and also for the purpose of moving some of his boxes out of a little stable in order that the defendant might put some hay in the stable. Mr. Oldham, the deceased, claimed that the defendant was still owing him for certain work that he had done on the dwelling and barn and mine and also for an expensive piece of machinery that he purchased and placed in the mine. A short time before noon Mr. Oldham left the mine going in the direction of the defendant's house, the defendant having gone to the house about one hour before. There was no witness present at the time of the shooting with the exception of the defendant himself. As to what happened at the time of the shooting the State introduced in evidence a short statement signed by the defendant, made by him before the coroner, the substance of which was that the deceased came into the defendant's bedroom, commenced talking to the defendant in a threatening and angry manner, thrust his hand into his overcoat pocket as though in the act of drawing some weapon, and that the defendant shot twice, using a double-barreled shot gun. The coroner, Dr. P. E. Coil, who resided at Mexico, Missouri, learned of the shooting and went at once in company with the prosecuting attorney and the sheriff to the home of the defendant, reaching there late in the afternoon of that day. The coroner testified that he found the body of deceased in the bedroom of the defendant; that deceased was lying on his back with his head close to a stove, his feet being about the center of the room. Near his head was the foot-rest on the stove, which was broken, the break appearing to be recent. In respect to the nature and character of the wounds inflicted upon the deceased, the testimony as introduced by the State also tended to show that there were two wounds, one on the right side of the back and the other on the left side of the back, the wounds ranging up,

the loads scattering and some of the bullets going out
in front.   It was claimed that one of the bullets was
deflected and some were still found in the body of the
deceased.   The deceased had on an overcoat, undercoat,
shirt, undershirt, pants and overalls.   The testimony
tended to show that after the killing he had no weapon
whatever in any of his pockets, but a small pocket knife
which was found in his pants pocket under his overalls.
In his right hand overcoat pocket was found a tele-
phone receiver.

The testimony of the sheriff was substantially
that he examined the room in which the deceased's
body was found but that he could find no bullets and
that while the deceased's clothing was very bloody he
found no blood on the carpet.   There was another wit-
ness who testified substantially that the deceased, be-
fore leaving the mine, got his wood rasp, which he
placed in his outside overcoat pocket.   This rasp was
about an inch and a half wide and about eighteen inches
long, and it was found by witness Ridgeway about the
premises of the defendant after the snow melted, some
three or four days after the killing.   It was found about
five or six feet east of the porch, which was the porch
opening into the bedroom where the body of the de-
ceased was afterwards found.

On behalf of the defendant the evidence tended
to show that he had settled with the deceased in full
and that deceased was in debt to him and in debt to
his miners and could not continue to run the mine; but
in order to be liberal toward the deceased the defendant
agreed to pay him $50 more, which the deceased re-
fused to accept and insisted on having still more.
Numerous and divers threats by the deceased to do
the defendant some great personal injury were also
shown.   These threats were made by the deceased and
were to the effect that he was not satisfied with the
settlement; that he had several hundred dollars in the

coal mine; that he was going to have it and that defendant could not live unless he paid the deceased. These threats were communicated to the defendant, the one made to the defendant's son being communicated within an hour or two of the final difficulty. The defendant's evidence further tended to show that after the deceased vacated the mine the defendant's son took possession and began running it, and that the deceased came down to the mine on the morning of the difficulty, and was looking after some of his property remaining at the mine and in the stable. The defendant and his father-in-law came down to the barn with a load of hay, which was unloaded in the barn, at which time they say the deceased refused to speak to the defendant. Before going to the barn the defendant's son warned the defendant that the deceased had threatened him and that he had better not go down while the deceased was there. Immediately after unloading the hay the defendant went back to the house and went into his bedroom and lay down on the lounge. In the course of a half an hour or an hour the deceased came up to the defendant's house, carrying a telephone box, met the defendants' wife and asked if he might leave the box there. She replied that he could and deceased set the box down and then asked for the defendant. Mrs. Edwards told him that the defendant had hurt his back and was lying down on the bed in his room, and invited the deceased to walk in. The deceased went in, got into a controversy with the defendant over the amount due him, and the defendant offered to pay him $100, but the deceased declined to accept it, saying that the defendant should not live, and running his hand into his overcoat pocket. As he thrust his hand into his pocket the deceased rose and either started toward the defendant or made a motion as if he was going to start, and then the defendant, who was sitting at his desk, grabbed his

double-barreled shotgun and fired twice at the deceased. The defendant further testified that he thought he shot the deceased in front, but he was not sure, but that the deceased fell on his back, breaking the footrest on the stove. The wife of the defendant came in about that time, and also testified to the fact that the deceased was shot in this room. The father-in-law of the defendant was telephoned for and came down to defendant's house, being the first to arrive; but he did not testify at the trial; and two physicians from Centralia were present and assisted in the post-mortem examination. One of the physicians, Dr. W. A. McAllister, of Boone county, testified on behalf of the State and corroborated Drs. Toalson and Coil, who also testified on behalf of the State, that both wounds took effect in deceased's body and were shot from behind. Dr. Wallace, the defendant's family physician, gave it as his opinion that the wounds entered in the front of deceased's body, though he could not account for some of the bullets found in the body nor some of the holes which were evidently points of exit.

There was other testimony offered by the State, over the objections and exceptions of the defendant, that the defendant's son who, it seems, was to take possession of and did take possession of the mine as soon as deceased vacated same, visited Centralia the Saturday before the shooting and purchased two pistols and a round of cartridges for each one, one of which he gave to a man named Buford Wheeler, who was a partner with the son in the coal mine, and the other pistol defendant's son carried himself, and had it in his pocket on the day of the fatal difficulty.

In rebuttal the State introduced witnesses Lincoln Cleveland and Ira Mayes; they substantially testified that immediately after hearing of the killing of the deceased the defendant's son, who was a witness for the defendant, called to the men at the mine and said,

"It has happened." There was other testimony in re-
buttal offered by the State to the effect that Buford
Wheeler, who testified that he was at deceased's house
before the killing and heard deceased make threats, was
not at deceased's house at that time. The son of the
deceased also substantially testified that Buford
Wheeler stated to him on the day of the preliminary
hearing that he never heard the deceased make any
threats against the defendant.

At the close of the evidence the court instructed
the jury upon murder in the first and second degrees,
manslaughter in the fourth degree, and upon the right
of self-defense, reasonable doubt and the credibility
of witnesses, and the cause being submitted to the jury
upon the evidence and instructions of the court, they
returned a verdict finding the defendant guilty, as be-
fore stated, of manslaughter in the fourth degree, and
assessing his punishment at two years' imprisonment
in the State penitentiary. Timely motions for new
trial and in arrest of judgment were filed and by the
court overruled. Judgment and sentence was pro-
nounced and entered of record in accordance with the
verdict, and from this judgment the defendant in due
time and proper form prosecuted his appeal to this
court.

### OPINION.

The record in this cause discloses the assignment
of numerous errors committed by the trial court as
grounds for the reversal of this judgment. We will
give to the complaints of appellant such attention as
their importance requires.

### I.

It is insisted by learned counsel for appellant that
the instruction of the court upon the subject of pro-
voking the difficulty was erroneous. This instruction
was as follows:

"The court instructs the jury that the right of a citizen to defend himself against danger is a right which the law concedes and guarantees to all men. Therefore, the defendant may have killed John Oldham and be innocent of any offense against the law. If at the time defendant shot John Oldham he had reasonable cause to apprehend on the part of said John Oldham a design to do defendant some great personal injury, and there was reasonable cause for defendant to apprehend immediate danger of such design being accomplished, and to avert such apprehended danger to himself, he shot said John Oldham, and at the time he did so he had reasonable cause to believe and did believe it necessary for him to shoot said John Oldham to protect himself from such apprehended danger, then and in that case the shooting was not felonious, but was justifiable and you will acquit him. It is not necessary to this defense that the danger should have been actual or real or that the danger should have been impending and immediately about to fall. All that is necessary is that defendant had reasonable cause to believe and did believe these facts. But before you acquit on the ground of self-defense you must believe that defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause of apprehension have been established by the evidence, you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the cause, you cannot acquit him on the ground of self-defense, even though you may believe that defendant really thought that he was in danger. On the other hand, the law does not permit a person to voluntarily seek or invite a combat or voluntarily put himself in the way of being assaulted in order that when hard pressed he may have a pretext to take the life of his assailant. The right of self-defense does not imply

the right of attack. But if he does not intentionally bring on the difficulty nor provoke it, nor voluntarily engage in it, he is not bound to flee to avoid it, but may resist with adequate and necessary force until he is safe."

In the discussion of the complaint lodged by the appellant against this instruction we must not overlook the fundamental rules as applicable to the giving of instructions either in civil or in criminal cases, that is, that it is essential in both criminal and civil cases that in order to authorize an instruction upon any particular subject involved in the cause, there should be at least some substantial evidence upon which to predicate the instruction, and it is error in either a civil or criminal cause to give an instruction without any evidence to support it. [State v. Allen, 116 Mo. l. c. 555; State v. St. John, 94 Mo. App. 229; State v. Bailey, 57 Mo. 131; State v. Chambers, 87 Mo. 406; State v. Herrell, 97 Mo. 105.]

Following the rule so clearly stated in the cases above cited, we are simply confronted with the proposition as to whether or not the facts as disclosed by the record in this cause furnish any support or basis for the giving of the instruction complained of by the appellant. We have substantially adopted the statement of what the evidence tended to prove as made by the Attorney-General and the prosecuting attorney of Audrain county representing the State in this cause, and after a careful analysis of the statement of the evidence by counsel for respondent, we are unable to find any testimony which authorized the trial court in giving that instruction. Counsel for respondent, in referring to what evidence the State introduced at the time of the shooting, say that "the State introduced in evidence a short statement signed by the defendant, made by him before the coroner, the substance of which was that the deceased came into

the defendant's bedroom, talked in an angry manner, thrust his hand into his overcoat pocket, and that the defendant shot him twice, using a double-barreled shot-gun." In addition to this the only witness who testi-fied as to what occurred at the time of the shooting was the defendant himself, and his testimony fails to disclose that he said or did anything which was calcu-lated to provoke a difficulty, and giving full force to all of the testimony introduced by the State or elicited from witnesses testifying for the defendant, there is an absolute failure to show any such state of facts as would authorize the court to give the instruction as heretofore indicated. While it may be true that the jury were not bound to believe the testimony as de-tailed by the defendant, yet the court would not be authorized to embrace this subject in its instructions to the jury, in the absence of any testimony tending to prove the facts involved in such subject, and thereby have the jury simply guess or surmise that the de-fendant sought the difficulty or brought it on for any unlawful purpose whatever. While it may be true that the defendant unnecessarily took the life of the de-ceased, yet if we are to longer regard the rules of law applicable to the trial of causes by jury, it must be held that it was error for the court to submit a question to the jury on mere conjecture and in the absence of any substantial testimony upon which to predicate such instruction.

We deem it unnecessary to pursue this subject further. We have read with a great deal of care the details of all the testimony in this cause and in view of the testimony disclosed by the record we see no escape from the conclusion that there was absolutely no testimony upon which this instruction could have been based.

That the giving of this instruction without any testimony upon which to base it was reversible error,

we only need to call attention to the uniform rulings of this court upon that subject. In State v. Chambers, supra, it was said by this court, touching a similar instruction to the one here complained of, that "the instruction was misleading; there being no evidence upon which to base it, it was calculated to prejudice the defendant before the jury." The Chambers case was approved in State v. Herrell, supra, and it was again held that it was error to give such an instruction without evidence.

In State v. Walker, 196 Mo. l. c. 85, it was said: "The law is that one may not deliberately seek and provoke a difficulty with another with a design to kill him and then invoke the right of self-defense, but it is also the law that when there is no evidence of such seeking and provoking a difficulty in order to get an opportunity to wreak one's vengeance on another, it is error for the trial court to frit away the right of self-defense by inviting the jury to enter the field of conjecture and excuse the aggressor on such ground when there is, as in this case, no basis for such a qualification of the law of self-defense."

In the recent case of State v. Gordon, 191 Mo. 114, the subject embraced in the instruction now under discussion was fully considered and all of the authorities exhaustively reviewed, and this court, after reviewing all of the authorities, said: "Our conclusion is that in the light of the more recent decisions of this court since the Partlow case, notwithstanding there are cases which seemingly conflict with the view, it is error to instruct that a defendant in a personal altercation forfeits the right of self-defense merely because he voluntarily engages in a difficulty. The occasions on which this right is forfeited have been pointed out in the foregoing excerpts from the decision in State v. Partlow, 90 Mo. 608, and in cases cited. The tenth instruction as applied to the facts in this record was,

in our opinion, misleading and erroneous. It was not made applicable to the state of the testimony and should not have been given even when modified by omitting the clause as to 'voluntarily entering into the difficulty,' without fully advising the jury as to what constitutes provocation that will justify an assault and as to what is meant by 'provoking a difficulty,' or 'being free from fault.' Mere words of reproach or opprobrious epithets do not constitute such provocation as would put the defendant in any degree in the wrong if it became necessary to kill Doelling in his own defense.''

## II.

It is insisted by appellant that the instruction by the court as to manslaughter in the fourth degree was misleading and did not properly declare the law as to that grade of crime. The instruction complained of was as follows:

"If the jury believe from the evidence in the cause that the deceased, John Oldham, had at intervals within a week or ten days prior to the homicide threatened to take the life of defendant or to do him great bodily harm, and continued making such threats up to and on the day of the homicide, and that such threats were communicated to the defendant (prior to the homicide) and that at the time the defendant shot and killed John Oldham, the defendant was acting under a violent passion of fear and excitement caused in part by the knowledge of such threats, and suddenly aroused by reason of said Oldham having used towards defendant threatening language, and by said Oldham jumping from his chair in a threatening manner, and by reason of an apprehension on the part of the defendant that said Oldham was in the act of drawing upon him a weapon for the purpose of killing him or of inflicting on him great personal injury; yet

if you further find and believe from all the evidence that the shooting of Oldham was not necessary to the self-defense of defendant as explained in other instructions, and believe that the apprehension of defendant that said Oldham was about to draw a weapon was not a reasonable apprehension under the circumstances surrounding the homicide, and believe that the apprehension of defendant that Oldham was about to attempt to kill defendant or to do him great injury was not a reasonable apprehension under the circumstances surrounding the homicide, then you will find the defendant guilty of manslaughter in the fourth degree.''

It is well settled in this State that where the defendant, if guilty at all, is guilty of a higher grade of offense than the one upon which he is convicted and upon which the court gave an instruction, he is in no position to complain of an instruction given upon such lower grade of crime, even though there was no evidence upon which to predicate it; however, it is equally well settled that, if the court undertakes to give an instruction upon a grade of offense not warranted by the testimony, the instruction must be a proper one embracing all of the essential elements of such offense, and while, if the instruction was a proper one, it may be said that the defendant would have no right to complain, yet if the court erroneously declares that if the jury find a certain state of facts which under the law would not constitute such lower grade of crime, the defendant clearly has the right to challenge the sufficiency of such instruction.

In State v. Gordon, supra, the rule as applicable to manslaughter was thus clearly stated: ''At common law words of reproach, how grievous soever, were not provocation sufficient to free the party killing .from the guilt of murder, nor were contemptuous or insulting actions or gestures without an assault upon the

person, nor was any trespassing against lands or goods to have the effect to reduce the guilt of killing to a grade of manslaughter; the provocation must consist of a personal violence. [1 East's Pleas of the Crown, 233; 4 Blackstone, Com., 201; State v. Wieners, 66 Mo. 13.] And the common-law rule in this respect is firmly • established in this State by a long line of decisions. [State v. Starr, 38 Mo. 271; State v. Branstetter, 65 Mo. 149; State v. Hill, 69 Mo. 451; State v. Elliott, 98 Mo. 150; State v. Gartrell, 171 Mo. 516-519.]"

This instruction, measured by the rule as announced in the Gordon case, is manifestly erroneous. It will be noted that the court in the instruction now under consideration authorized the jury to predicate the arousing in defendant of a violent passion upon a state of facts which under the uniform rulings of this court has been deemed insufficient to reduce the killing from murder to manslaughter, and it is directly in conflict with the rules and authorities cited in State v. Gordon, supra. It will be noted that this instruction makes threats by the deceased made a week or ten days prior to the homicide as a part of the basis for the excitement and passion aroused in the defendant. Such threats were inadmissible for any such purpose, and should never be admitted simply on the question of provocation. A review of the long line of decisions in this State will demonstrate that evidence of threats by the deceased against the defendant is confined to that class of cases where the evidence tends to show some act or conduct upon the part of the deceased threatening immediate injury to the defendant or tending in some way to prove that the homicide was committed in self-defense. [State v. Brown, 63 Mo. 439; State v. Spencer, 160 Mo. 118; State v. Harrod, 102 Mo. 590.]

It is apparent that the threats introduced in evidence in the case at bar were applicable alone to the

issue of self-defense and it was error for the court to instruct the jury that such threats constituted any part of the elements of provocation which would reduce the killing from murder in the first or second degree to manslaughter in the fourth degree.

### III.

It is urged by the defendant that the court committed error in refusing the following instruction requested by the defendant:

"The court instructs the jury that even though you may believe that the balls fired from defendant's gun struck the deceased on the back or sides and ranged forward, yet if from all the evidence you believe that at the time the defendant fired the shots he believed and had reasonable grounds to believe that deceased was about to kill him or inflict great bodily injury upon him and that he shot in good faith to protect himself and ward off the impending danger, then under the law his act is justifiable and you should acquit him."

In our opinion there was no error in the refusal of this instruction. The court in other instructions had fully declared the law of self-defense and it was the province of the jury to consider all the evidence as applicable to such defense without having their attention called specially to a theory that the deceased may have been shot in the back or on the side, and yet such fact would not deprive defendant of the right of self-defense. This instruction is suggestive of an argument along certain lines rather than a clear and plain declaration of law upon the question of self-defense. The law upon that subject was fully declared for the defendant and there was no error in the court's refusing the instruction now under consideration.

203 Sup—35

## IV.

Complaint is made by appellant that the court during the progress of the trial indorsed a theory of the State that uncommunicated threats by the deceased were immaterial. The court admitted the testimony as to uncommunicated threats, and it is only necessary to say, as this case is to be retried, that the law upon that subject is well settled that uncommunicated threats are admissible in evidence not for the purpose of showing apprehension of danger, but as throwing light upon the acts and conduct of the deceased at the time of the fatal difficulty and for the purpose of showing who was the aggressor in such difficulty.

## V.

Complaint is made as to the cross-examination of the son of the defendant while down at the mine, in which he was asked the question, after having heard of the killing of Oldham, as to whether or not he did not say in the presence of Lincoln Cleveland, "Well, it has happened." We are of the opinion that there was no reversible error in this cross-examination. He was the son of the defendant and great latitude should be allowed in the cross-examination of such a witness.

## VI.

It is insisted by appellant that the court committed error in admitting the testimony of the witness Mr. Canatski. This witness's testimony had reference to the purchase by the son of the defendant, James A. Edwards, of two revolvers in the town of Centralia about the 17th of March, and the witness detailed a conversation between him and young Edwards about the purchase of the pistols and the purpose of purchasing them. We are unable to see upon what theory this testimony was admitted. Our attention has not been called to anything which connects it with the

killing of Oldham by young Edwards' father. It is not claimed or pretended that the killing was done with a pistol, for it is conceded that the killing was done with a shotgun. Therefore, we cannot escape the conclusion that this testimony was entirely irrelevant and immaterial, and even though young Edwards may have denied certain statements made in respect to the purchase of the pistols, or statements made at the time of their purchase, yet the testimony being immaterial the witness was not subject to impeachment upon that class of testimony.

## VII.

As to the complaint lodged against the testimony of Dr. Paul E. Coil, it is sufficient to say, as this case is to be retried, that the trial court should only admit his testimony upon a reasonably satisfactory showing that he is qualified to testify as an expert. After this showing is made as to the facts susceptible of proof by the opinion of an expert, the doctor is a competent witness and his testimony should be admitted.

We have thus indicated our views upon the main propositions disclosed by the record, which results in the conclusion that the trial court committed error in the particulars as heretofore indicated. The judgment therefore should be reversed and the cause remanded for a new trial, and it is so ordered.

All concur.